UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KELLY LERAY BARNES                           CIVIL ACTION

VERSUS                                       NO. 09-3352

SHERIFF ROBERT CROWE                         MAGISTRATE JUDGE
ET AL.                                       JOSEPH C. WILKINSON, JR.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Kelly LeRay Barnes, is a prisoner currently incarcerated in the Concordia

Parish Correctional Facility in Ferriday, Louisiana. In this case, Barnes alleges violations

of his constitutional rights pursuant to 42 U.S.C. § 1983. He seeks compensatory

damages for physical injuries allegedly suffered during his arrest on May 1, 2008, during

which he asserts that defendants, Washington Parish Sheriff's Deputy Detective Robert

Harris and Deputy L. Scott Crain, used excessive force against him. Barnes also claims

that he received constitutionally inadequate medical care at the Washington Parish Jail

for injuries he suffered during his May 1, 2008 arrest. He also named as defendants

Washington Parish Sheriff Robert Crowe; Demille Topps, warden of the Washington

Parish Jail; Kim Brumfield; and Deputy Chaplain.

This matter was referred to a United States Magistrate Judge for all proceedings

and entry of judgment in accordance with 28 U.S.C. § 636(c) upon written consent of all

parties. Record Doc. No. 45. Trial was conducted before the court without a jury on March 15, 2010.

After the trial concluded, plaintiff's mother, Mae Barnes ("Ms. Barnes"), who had testified at trial, wrote a letter to the court dated March 19, 2010. The letter was filed into the record, Record Doc. No. 48, and I sent copies to plaintiff and to defendants' counsel.

Plaintiff sent the court a letter dated April 7, 2010, in which he thanked the court for sending him his mother's letter, saying that he was unaware she was going to write and that "she only wanted to help." He also stated that he wanted "to make sure that you have a copy of the test results that I mentioned during the trial" and explained why he believes the results are significant. The document attached to the letter is a copy of laboratory test results from LSUHSC-Bogalusa Medical Center dated July 21, 2008. The document was filed in the court's record under seal, and a copy was sent to defendants' counsel. Record Doc. No. 49.

The court treats plaintiff's April 7th letter as a motion to reopen the record to introduce into evidence his mother's letter, his own letter and the test results. However, a certified copy of the test results is already in the record. Record Doc. No. 32.

Accordingly, IT IS ORDERED that the MOTION IS DISMISSED AS MOOT IN PART as to the laboratory test results. IT IS FURTHER ORDERED that the remainder

of the motion is DENIED as to the letters to the court from Ms. Barnes and plaintiff. Unlike testimony and evidence introduced at trial, the letters are not sworn and none of the information contained in them is subject to cross-examination. Fed. R. Evid. 603, 611(b), 901(a). Moreover, each letter contains inadmissible hearsay. Fed. R. Evid. 801(c), 802. Therefore, the two letters are <u>not</u> admitted into evidence.

Having considered the written and testimonial evidence adduced at trial, the record, the arguments and written submissions of the parties, and the applicable law, the court makes the following findings of fact and conclusions of law:

## <u>FINDINGS OF FACT</u>

1.      In reaching these findings of fact, I credit the testimony of the defense witnesses over the testimony of plaintiff.

2.      I find that the testimony of defendants' witnesses, and of Deputy Detective Harris in particular, is credible. The bearing, background, demeanor, obvious sincerity and straightforward manner of testifying of Detective Harris, Deputy Crain, Warden Topps and Brumfield convince me of their truthfulness. Specifically, each witness's demeanor and manner of testifying were calm, detailed and specific. Their testimony and the documentary evidence corroborate each other with only a very few, minor, insignificant discrepancies that in no way alter my finding that they are credible. These

witnesses neither exaggerated nor embellished their testimony in their own self-interest. Thus, I find the testimony of each defense witness credible.

3.     I find that the testimony of plaintiff's mother, Mae Barnes ("Ms. Barnes"), is credible.  Her bearing, background, demeanor, obvious sincerity and straightforward manner of testifying convince me of her truthfulness.   Nonetheless, I find that the reddish, almost healed laceration that she described having seen on plaintiff's face about three weeks after he was arrested on May 1, 2008 was caused by the circumstances of his attempted escape from the Sheriff's deputies and/or by the deputies' use of force that was reasonably necessary to overcome plaintiff's resistance to arrest, not to any unconstitutionally excessive force.

4.     I find that plaintiff's testimony lacks credibility.  Certain details in his testimony are implausible, exaggerated or unbelievable, such as his allegations that he was free to walk out of the jail after he was arrested simply because no deputy was watching him, that Detective Harris hit Barnes in the head with the detective's weapon, that plaintiff was repeatedly kicked in the ribs by several deputies and that he was permanently disfigured.  Some details of plaintiff's testimony are contradicted by the documentary evidence, such as his testimony that he was bleeding profusely after he was arrested.  In addition, despite being asked by the court about his convictions during his direct testimony, Barnes failed to mention his conviction for simple escape until he was

cross-examined about it.  Plaintiff's bearing, demeanor and manner of testifying, coupled with the implausibility of some of his testimony and the absence of credible corroborating evidence, all lead me to credit the testimony of the defense witnesses over that of plaintiff.

5.     Based on the credible testimony of Detective Harris and Deputy Crain and the other credible record evidence, I find that neither Detective Harris nor Deputy Crain used excessive force against Barnes during the subject incident.  I further find that they used only reasonable force that was necessary to overcome plaintiff's flight and resistance to arrest.  Based on the credible testimony of Warden Topps and Brumfield and the other record evidence, I find that defendants were not deliberately indifferent to any serious medical need and that plaintiff received adequate medical care at the Washington Parish Jail for injuries he received while attempting escape and resisting arrest.

6.     At the pretrial conference, defense counsel stated that Deputy Chaplain, whom plaintiff had named in his complaint as his arresting officer, did not exist. Because plaintiff contested this assertion, I reserved determination of this factual dispute until trial.   No evidence was presented at trial concerning any Deputy Chaplain. Therefore, I find that all claims against Deputy Chaplain should be dismissed.

7.     Barnes is currently incarcerated at Concordia Parish Correctional Facility in Ferriday, Louisiana.  He was convicted on June 15, 2009 of being a convicted felon in possession of firearms and of possession with intent to distribute cocaine, and is currently serving a sentence of 10 years for those convictions.  He was also convicted on the same date of simple escape and is serving a one-year consecutive sentence for that conviction.

8.     On April 30, 2008, Deputy Crain, who had been a police officer for more than 20 years, was assigned to the Washington Parish Drug Task Force.  He conducted a traffic stop of a vehicle in Bogalusa, Louisiana, that night.  Barnes was driving the vehicle and another man, Kaunda Magee, was a passenger.  Both men were arrested when Deputy Crain found two 45 mm. semi-automatic guns and a quantity of crack cocaine in the vehicle.

9.     Barnes and Magee were taken to the Washington Parish Jail in Franklinton for booking in the early morning hours of May 1, 2008.  While awaiting booking, they were not handcuffed.  Around 4:00 to 5:00 a.m., when they apparently were not being observed by any deputies, Barnes and Magee walked out of the jail.  Barnes knew that he had been arrested, that he did not have permission to leave and that it "was not okay" to leave, but he left because he saw an opportunity to flee.

10.     Deputy Crain was called back on duty when Barnes and Magee escaped from the Washington Parish Jail.  He returned to the jail, where he was told that canine teams had been unsuccessful in tracking the pair.

11.     Around 7:00 or 8:00 a.m. on May 1, 2008, Barnes and Magee were riding in the back seat of a car that was being driven by Sharonda Jefferson in Franklinton.

12.     On May 1, 2008, Detective Harris had been a Sheriff's deputy since 2001 and was a canine handler assigned to criminal patrol.  He received a call from dispatch that two arrestees had escaped.  He met with other deputies at the jail, where he learned that Barnes and Magee had been arrested the night before with two .45 millimeter weapons and that Barnes should be considered dangerous.  Detective Harris saw mug shots of both men.  Detective Harris, Deputy Crain and other Sheriff's deputies fanned out in Franklinton to search for the escapees.

13.     Deputy Crain knew that Jefferson was Magee's sister.  As he drove through Franklinton, he saw her driving a black Durango.  He turned his vehicle around to approach her, but she drove off and the vehicle disappeared from his sight.  He radioed a description of the vehicle to other officers.  A few minutes later, another deputy, identified as Detective Goings, radioed that he was following the Durango.

14.     After being followed for four or five blocks by Detective Goings in one Sheriff's vehicle and Detective Harris behind him in another vehicle, Jefferson pulled the

Durango into a parking lot. Several Sheriff's vehicles, including Detective Harris's, blocked the Durango from moving. Barnes and Magee jumped out of the back seat of the car and sprinted away.

15.     Detective Harris saw Barnes clearly and recognized from his mug shot. Detective Harris exited his vehicle, identified himself as a Sheriff's deputy and chased Barnes on foot.   Detective Harris yelled repeatedly at Barnes to stop because he was under arrest, but Barnes kept running. Deputy Crain, who was three or four vehicles behind Detective Harris, saw Detective Harris run after Barnes. Deputy Crain followed on foot about 20 to 30 yards behind Detective Harris.

16.     Detective Harris believed that Barnes might be armed.  Detective Harris saw that Barnes kept his right hand in his pants and kept looking back at the detective running after him.  Detective Harris stood still, drew his weapon and yelled at Barnes to stop and show his hands, or the detective would shoot him.  Barnes yelled, "Please, God, don't kill me," and ran faster.

17.     Detective Harris holstered his weapon without firing it and ran after plaintiff.  Detective Harris chased Barnes for three to four blocks. Deputy Crain twice lost sight of the two men, but then saw them going up an embankment.

18.     Barnes ran up a steep hill, which had been cleared at its base.  Above the cleared area, the hill was overgrown with briars and vines, and was piled with broken

branches and the cut-off tops of pine trees to a depth of two and one-half to three feet. Barnes's progress was slowed by the incline, vegetation and debris. Detective Harris caught up with him 30 to 50 feet up the hill and tackled him. Barnes fell to the ground and kicked Detective Harris in the chest. Detective Harris fell backwards and lost his grip on plaintiff's foot as plaintiff's shoe came off. Barnes regained his feet and continued uphill. Detective Harris got up and tackled Barnes again. Plaintiff fell face down in the brush.

19. Barnes struggled with Detective Harris. Plaintiff turned from his front to his back and then again to his front. He squirmed, kicked and swung his hands at Detective Harris. He tried to crawl away, to push himself up with his hands and to get back on his feet. Detective Harris struck plaintiff with his knee a couple of times to try to subdue him. Detective Harris repeatedly told Barnes to stop resisting and submit to arrest. Both men suffered cuts and scrapes on their faces and arms and Detective Harris's pants ripped during the struggle, which lasted for 30 to 60 seconds.

20. Deputy Crain caught up with the two men struggling on the ground. As Deputy Crain got close to them, Detective Harris looked up and said that he was tired. Deputy Crain yelled, "Taser! Taser!"

21. Barnes was on his stomach with his hands beneath his body and his hips raised, trying to get up. Detective Harris had attempted to get plaintiff's hands free so

he could handcuff plaintiff, but Barnes would not give up his hands.  When Detective Harris heard Deputy Crain yell, Detective Harris rolled off of plaintiff.

22.     Deputy Crain administered a drive-stun Taser cycle, which emitted a five-second shock, to plaintiff's shoulder blade.  Deputy Crain released the trigger and the Taser recharged.  Although stunned briefly, Barnes recovered and continued to resist Detective Harris.  Deputy Crain administered another five-second stun cycle to the same shoulder, and Barnes stopped resisting.

23.     Detective Harris then handcuffed Barnes.  Barnes told Detective Harris that he would sue him.  Detective Harris responded with words along the lines of the following:  "Look at me.  See my face.  I'm the one who caught you.  Remember."

24.     Barnes was entangled in the brush, and Detective Harris and Deputy Crain had to free him from the vines.  Barnes did not complain of any injuries to either deputy.  Other officers arrived at that point, and they took Barnes down the hill and put him into the back seat of a sheriff's vehicle.

25.     I find that Detective Harris did not draw his weapon again after he holstered it.  I further find that he did not have a gun in his hand during the struggle on the hill, and he did <u>not</u> hit Barnes in the head with a gun at any time.

26.     I further find that no officer, including Deputy Crain, administered any Taser shocks to plaintiff or kicked Barnes after he was handcuffed.

27.     Barnes was booked at 12:55 p.m. on May 1, 2008 with simple escape, resisting an officer (flight on foot) and resisting arrest. Defendant's Exhs. 4, 5. He entered an <u>Alford</u> plea[1] of guilty to being a felon in possession of firearms, possession of cocaine and simple escape.

28.     The injuries that plaintiff claims to have sustained during his attempted escape were lacerations on the right side of his head, mouth and right eye and soreness in his rib area.

29.     According to the Booking Medical Sheet, which is a form that comes up on the computer screen during every booking, Barnes did not exhibit any injuries when he arrived at the Washington Parish Jail on May 1, 2008. When he was booked, the booking officer answered "no" in response to the question on the Booking Medical Sheet whether plaintiff had any visible signs of trauma. Defendant's Exh. 5.[2]

30.     The Sheriff has a policy of not admitting a new prisoner into a jail cell if he has any visible signs, such as bleeding, that he needs medical attention. Such a prisoner

---

[1]An <u>Alford</u> plea is a "guilty plea that a defendant enters as part of a plea bargain, without actually admitting guilt." <u>Black's Law Dictionary</u> 83 (9th ed. 2004) (citing <u>North Carolina v. Alford</u>, 400 U.S. 25 (1970)).

[2]Unlike another form indicating that Barnes received an admission kit, a mattress, a jumpsuit and a blanket upon admission to the jail, which is signed by Barnes and includes the name of the booking officer, Defendant's Exh. 4, the Booking Medical Sheet is not signed by either the attending officer or the inmate on the signature lines provided. Defendant's Exh. 5.

is sent to the hospital for medical clearance before being admitted to a cell. Plaintiff was not sent to a hospital, but was admitted to a cell on May 1, 2008.

31.     Barnes testified that, since his fight with Detective Harris, he has had "migraine headaches" every couple of weeks, a constant pressure in his head, which he described as similar to "having water in your ears," and blurred vision in his right eye. He attributed all of these conditions to having been hit in the head with a gun during his attempted escape from Detective Harris. Although I have found that Detective Harris never hit plaintiff with a weapon, Barnes can bring a claim for inadequate medical care while he was incarcerated, regardless of the cause of his medical problems.

32.     Brumfield is in charge of medical records at the Washington Parish Sheriff's Office. She has no medical training. She authenticated the handwriting in Plaintiff's Exhibit A as her own, although she did not recall having written it.

33.     Plaintiff's Exhibit A is a memorandum from Brumfield to Barnes dated December 2, 2008, in which she "agree[d]" that a followup appointment for the results of his August 18, 2008 CT scan was "long overdue." She stated in the memorandum that "[t]his has been a neglect on my part," but said she was not previously aware that she was supposed to make a followup appointment. She told Barnes that she would make an appointment for him as soon as possible, but that it would be after the New Year.

34.     At trial, Brumfield confirmed that plaintiff had seen a doctor before she wrote this memorandum and that he had received followup medical care in January 2009, as she had promised in the memorandum. She would have scheduled him for an earlier appointment if she had known that he needed one, but the Transport Office and Medical Office never advised her that he needed a followup appointment.

35.     A doctor has been employed by Washington Parish to work at the jail since February 2009. Before that, there were no doctors or nurses at the jail or on call. While plaintiff was incarcerated at the Washington Parish Jail, the sick call procedure was for an inmate to fill out a medical request form and submit it to Brumfield. When she received a request, her policy was to call and make an appointment for the inmate with a medical professional. She usually called Dr. Hortman at LSU Bogalusa Medical Center and he would tell her whether he could see the inmate. If he could not, she would try to find another doctor.

36.     The medical records in evidence are the certified medical records from the LSU Bogalusa Medical Center, Record Doc. No. 32, and the Huey P. Long Medical Center in Pineville, Louisiana. Record Doc. No. 44, which were admitted into evidence as Plaintiff's Exhibits E and F. Barnes confirmed that the records accurately reflect the treatment he received while incarcerated at the Washington Parish Jail.

37.     The medical records reveal that Barnes was taken to a hospital outpatient clinic for examination and testing several times.  On July 17, 2008, he was seen by Dr. Walter Campbell at the LSU Bogalusa Medical Center Outpatient Clinic, where he complained of mild, intermittent left knee pain since 2002 and headaches and blurred vision since being struck in the head about two and one-half months earlier.  He asked to be tested for sexually transmitted disease.  Physical examination was normal.  Dr. Campbell's impressions were that Barnes had high blood pressure and had been exposed to chlamydia.  The doctor recommended testing for chlamydia and prostate cancer. Barnes returned to give blood and urine samples on July 21, 2008.

38.     On August 14, 2008, plaintiff went to the LSU Bogalusa Medical Center Outpatient Clinic for follow-up of his test results, which were negative for chlamydia, gonorrhea and prostate cancer.  He complained of headaches and blurred vision for the past three months.  Other than a rash on plaintiff's feet, his physical examination was normal.  Noting that Barnes had decreased vision with head movement, Dr. Campbell recommended a CT scan.

39.     On August 18, 2008, plaintiff had a CT scan of his brain and blood tests for hepatitis A, B and C and syphilis,[3] which were negative for syphilis.  The only finding

_____

[3]Plaintiff had an "RPR Screen," or a rapid plasma reagin test, which is a screening test for syphilis. Dorland's Illustrated Medical Dictionary 1811, 1812 (29th ed. 2000) (hereinafter "Dorland's").

on the CT scan was of patchy areas of decreased attenuation[4] in the cerebral white matter, which was <u>not</u> suggestive of any acute[5] process. The radiologist could not make a diagnosis based on this test, but potential diagnoses among several possibilities included prior head trauma, early microvascular disease, vasculitis[6] or the results of an inflammatory infection. The radiologist recommended an MRI for further evaluation.

40.     On January 21, 2009, Barnes returned to the LSU Bogalusa Medical Center Outpatient Clinic for follow-up of the CT scan and lab test results. He complained of decreased vision in his right eye and a past head injury. Physical examination was normal. Dr. Richard Hortman's impression was decreased vision, right eye, with questionable refractive [illegible word, possibly "loss"]. He recommended a referral to the LSU Eye Clinic.

41.     Barnes was transferred out of Washington Parish Jail on July 16, 2009. He was seen at Huey P. Long Medical Center in Pineville, Louisiana, on December 29, 2009. He complained of frequent headaches and reported some relief with ibuprofen. He told the examining physician, Dr. Watts Webb, that he had been pistol-whipped on the right

---

[4]Attenuation is "the process by which a beam of radiation is reduced in energy when passed through tissue or other material." <u>Id.</u> at 172.

[5]Acute means "having a short and relatively severe course." <u>Id.</u> at 25.

[6]Vasculitis is inflammation of a blood or lymph vessel. <u>Id.</u> at 1935.

side of his head in April 2008 and had suffered frequent headaches since, primarily on the right, but had not experienced any seizures or motor or sensory loss. Barnes said his vision was unchanged. Dr. Webb reviewed the results of the August 18, 2008 CT scan and ordered an MRI of plaintiff's brain and a neurosurgery consult. Dr. Webb's working diagnosis was cerebral microvascular disease.

42.     An MRI of plaintiff's brain was performed on January 25, 2010 at Huey P. Long Medical Center. The only abnormal finding was that he had "[a] small amount of fluid in the right mastoid air cells." The diagnosis was "mild right sided mastoiditis." Plaintiff's Exh. F; Record Doc. No. 44.

43.     The mastoid is a part of the temporal bone, which is the irregular bone "forming part of the lateral surfaces and base of the skull, and containing the organs of hearing."[7] The mastoid is in the lateral region, or side, of the head.[8] Mastoiditis is an inflammation of the mastoid cavity and mastoid cells, "sometimes as a result of otitis media."[9] Otitis media is an "inflammation of the middle ear."[10] Otitis media is caused by a bacterial or viral infection, usually as a result of an upper respiratory infection, while

---

[7]Dorland's at 1064, 1283.

[8]Id. at 965, 1797.

[9]Id. at 108, 1064.

[10]Id. at 1292.

mastoiditis is caused by a bacterial infection.[11]  Headache and a feeling of fullness in the

ear are common symptoms of mastoiditis.[12]  The symptoms that Barnes described at trial,

namely, headaches and a constant pressure in his head that is similar to "having water in

your ears," are consistent with the diagnosis of mastoiditis.

44.     At plaintiff's request during trial, I examined the scar that he claims resulted

from being hit on the head with a gun during the fight with Detective Harris.  I find that

Barnes has only a slight indentation barely visible on the right side of his head.

## CONCLUSIONS OF LAW

1.     This court has subject matter jurisdiction over the federal claims in this

matter.  28 U.S.C. § 1331.  Venue is proper in this district.

2.     Barnes alleges that Deputy Detective Harris and Deputy Crain violated his

Fourth Amendment rights by using excessive force during his arrest.  "Both unlawful

detention and excessive force implicate the Fourth Amendment's proscription against

unreasonable seizures. . . . '[W]henever a police officer accosts an individual and

restrains his freedom to walk away, he has "seized" that person.'"  Peterson v. City of

---

[11]The Merck Manual of Diagnosis and Therapy 2331, 2333 (Robert Berkow & Andrew J. Fletcher, eds., 16th ed. 1992).

[12]Id. at 1421, 1424.

Fort Worth, 588 F.3d 838, 845 (5th Cir. 2009), petition for cert. filed, 78 U.S.L.W. 3501

(U.S. Feb. 16, 2010) (No. 09-983) (quoting Terry v. Ohio, 392 U.S. 1, 16 n.16 (1968)).

3.    The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures.  The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable.  The touchstone of the Fourth Amendment is thus reasonableness. We measure reasonableness in objective terms by examining the totality of the circumstances.

Id. at 844 (quotations omitted).

4.    The Fourth Amendment reasonableness standard applies to the use of force during an arrest.  Sanchez v. Fraley, No. 09-50821, 2010 WL 1752123, at *2 (5th Cir. Apr. 30, 2010); Harper v. Harris County, 21 F.3d 597, 600 (5th Cir. 1994).

5.    Assessing the reasonableness of a police officer's use of force involves "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  This balancing "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  We judge the reasonableness of an officer's conduct "objectively," that is, without reference to the subjective intent or motivation that underlies the officer's conduct.  We must also look at the facts and circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  And we must account for the difficult and often

> split-second decisions that police officers must make in carrying out their duties.

Lytle v. Bexar County, 560 F.3d 404, 411 (5th Cir. 2009), cert. denied, 2010 WL 182938, 78 U.S.L.W. 3447 (U.S. Mar. 22, 2010) (No. 09-851) (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989) (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985))).

6.     To establish a claim of excessive force, a plaintiff must show that "he suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." Peterson, 588 F.3d at 846 (quotation omitted).

> 7.     In evaluating excessive force claims, courts may look to the seriousness of injury to determine whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction as is tantamount to a knowing willingness that it occur.  Thus, the extent of [the] injury inflicted may be considered in determining whether the officers used excessive force.

Deville v. Marcantel, 567 F.3d 156, 168 (5th Cir. 2009) (quotations omitted).

8.     Defendants have asserted the defense of qualified immunity.  "Qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Lytle, 560 F.3d at 409 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

9.   Assessing a defendant's entitlement to qualified immunity consists of two separate inquiries. First, we ask whether the facts . . . show that the defendant's conduct violated a constitutional right. We then ask whether the right violated was clearly established at the time. While it is "often appropriate" to answer these two questions sequentially, courts are vested with "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first."

Sanchez, 2010 WL 1752123, at *1 (quoting Pearson v. Callahan, 129 S. Ct. 808, 818

(2009); Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson, 129 S.

Ct. at 818).

10.   If the court

determines that the alleged conduct did not violate a constitutional right, our inquiry ceases because there is no constitutional violation for which the government official would need qualified immunity. If, however, the alleged conduct amounts to a constitutional violation, then we ask the "qualified immunity question" of whether the right was clearly established at the time of the conduct. Qualified immunity allows for officers to make reasonable mistakes about whether their conduct violates the law, and an officer's mistake is reasonable when there are insufficient indicia that the conduct in question was illegal. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

Lytle, 560 F.3d at 410 (quoting Saucier, 533 U.S. at 202) (citation omitted).

11.   Allegations that an officer used excessive force in conducting a seizure complicates the Saucier inquiry. This complexity stems from having to make two "overlapping objective reasonableness inquir[ies]." We must first answer

the constitutional violation question by determining whether the officer's conduct met the Fourth Amendment's reasonableness requirement . . . . If we find that the officer's conduct was not reasonable under the Fourth Amendment, we must then answer the qualified immunity question by determining whether the law was sufficiently clear that a reasonable officer would have known that his conduct violated the constitution. In other words, at this second step, we must ask the somewhat convoluted question of whether the law lacked such clarity that it would be reasonable for an officer to erroneously believe that his conduct was reasonable. Despite any seeming similarity between these two questions, they are distinct inquiries under Saucier, and we must conduct them both.

Id. (citing Saucier, 533 U.S. at 210 (Ginsburg, J., concurring in the judgment)).

12.     Thus, I first address whether the conduct of Deputy Detective Harris and Deputy Crain met the Fourth Amendment's reasonableness requirement. Applying the foregoing legal standards to the facts established above, I find that the use of force against plaintiff by Deputy Detective Harris and Deputy Crain was not excessive to any need and was objectively reasonable under the circumstances.

13.     The crime of escape from police custody, after plaintiff had been arrested for being a felon in possession of firearms and possession of cocaine with intent to distribute, was sufficiently serious to prompt the responses of Detective Harris and Deputy Crain. Barnes attempted to evade arrest by flight by hiding in the vehicle driven by Jefferson, who drove away when Sheriff's officers pursued her vehicle and did not

stop until the vehicle was blocked. Barnes actively resisted arrest and attempted to evade arrest by flight by jumping out of the car and running for three to four blocks, despite Detective Harris's continued lawful commands to stop, show his hands and submit to arrest. Barnes actively resisted arrest and attempted to evade arrest by flight by kicking Detective Harris in the chest; squirming, kicking and swinging his hands at Detective Harris after being tackled a second time; keeping his hands out of sight, either in his pocket while running or under his body during the struggle on the ground; and refusing to allow himself to be handcuffed. Detective Harris and Deputy Crain did not know whether Barnes was armed, but reasonable officers in those circumstances would have been justified in believing that he posed a serious threat to them and to the public when they knew that he had a prior arrest history, had been arrested in possession of firearms the night before, had been out of police custody for a few hours and could have armed himself during that time.

14. Detective Harris's use of force to restrain Barnes, including tackling him twice and wrestling with him on the ground while Barnes continued to resist, was reasonable under the circumstances. Deputy Crain, as he ran behind Detective Harris for three to four blocks, heard Detective Harris command Barnes to stop, saw Detective Harris tackle Barnes and struggle to restrain him, and heard Detective Harris say that he

was tired when Deputy Crain approached. Deputy Crain's two, five-second Taser applications to subdue plaintiff were reasonable under the circumstances.

15.    In <u>Manis v. Lawson</u>, 585 F.3d 839 (5th Cir. 2009), the Fifth Circuit held that an officer's use of <u>deadly</u> force is not excessive

> when a suspect moves out of the officer's line of sight such that the officer could reasonably believe the suspect was reaching for a weapon. . . . Manis ignored approximately five commands to show his hands and repeatedly reached under the front seat. [The officer] stated that he fired his weapon when Manis "made a bigger lunge like he had retrieved something."

<u>Id.</u> at 844 (citing <u>Ontiveros v. City of Rosenberg</u>, 564 F.3d 379, 381, 385 (5th Cir. 2009) ("[T]he suspect ignored the officer's commands to show his hands and was shot when he reached into a boot for what the officer believed could have been a weapon."); <u>Reese v. Anderson</u>, 926 F.2d 494, 500-01 (5th Cir. 1991) ("[T]he suspect repeatedly disobeyed the officer's instructions to raise his hands, drawing fire when he tipped his shoulder and reached below the officer's line of sight to the floorboard of his vehicle."); <u>Young v. City of Killeen</u>, 775 F.2d 1349, 1351-53 (5th Cir. 1985) ("[T]he suspect responded to the officer's order to step out of his car by reaching down to the floorboard instead, also drawing fire.")). If the use of gunfire was not excessive force in these Fifth Circuit cases, the much more restrained use of force by Detective Harris and Deputy Crain in the circumstances caused by Barnes's flight and active resistance, which included plaintiff's

ignoring Detective Harris's repeated commands to show his hands, also was not excessive.

16.     Plaintiff's resulting injuries, which he described as lacerations on the right side of his head, mouth and right eye and soreness in his rib area, were slight and caused entirely by his own efforts to escape and his continued resistance to Detective Harris. His subsequent complaints of "migraine headaches" and a constant pressure in his head, which were diagnosed as mild mastoiditis 21 months later, and blurred vision in his right eye, even if they were causally related to his fight with Detective Harris (which was not proven), did not result directly and only from the use of force that was excessive to the need, but from the application of force that was objectively reasonable in the circumstances.

17.     Barnes has failed to prove a violation of a Fourth Amendment right. Accordingly, I need not address the second question of the qualified immunity inquiry on his claim of excessive force. However, even if plaintiff had proved a constitutional violation and I needed to address the second question of whether the law was sufficiently clear that a reasonable officer would have known that his conduct violated the Constitution, Detective Harris and Deputy Crain would be entitled to qualified immunity because their actions were objectively reasonable in light of the clearly established law at the time.

18.     "[T]he 'objective legal reasonableness' of an officer's conduct must be 'assessed in light of the legal rules that were "clearly established" at the time' of his action.  A right is clearly established if, in light of preexisting law, the unlawfulness of an action would be apparent to a reasonable officer."  Manis, 585 F.3d at 846 (quoting Anderson v. Creighton, 483 U.S. 635, 639-40 (1987)).  The inquiry here is whether, under the law in effect at the time, no reasonable officer could have believed that physical force and the use of a Taser was lawful when Barnes, a suspect with a known record of having been arrested the night before on charges of being a felon in possession of weapons and possession of cocaine with intent to distribute and a known record of a prior home invasion, fled by car and on foot; disobeyed repeated commands to stop, show his hands and submit to arrest; kept his hands out of the officer's line of sight and out of the officer's grasp; and actively resisted arrest in a physical struggle.  See id. at 846 & n.4 (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999)) (The right that must be clearly established is not plaintiff's "general Fourth Amendment right to be free from an unreasonable seizure.  The . . . 'right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.' . . . Thus, we conduct the more particularized inquiry of whether preexisting law clearly established" plaintiff's right to be free from excessive force in the particular circumstances.).

19.     In <u>Manis</u>, the Fifth Circuit found that an officer's use of <u>deadly</u> force was objectively reasonable when the suspect had shouted obscenities, flailed his arms aggressively at the officer, reached repeatedly under the front seat of his vehicle where he was seated, ignored several orders to show his hands, appeared to retrieve some object from under the seat and began to straighten up. <u>Id.</u> at 842, 846. In the instant case, Detective Harris's use of physical force with his own body and Deputy Crain's use of two Taser shocks to subdue Barnes were much more limited and restrained uses of force than in <u>Manis</u> and were objectively reasonable in the circumstances. <u>See also</u> <u>Draper v. Reynolds</u>, 369 F.3d 1270, 1278 (11th Cir. 2004) (Officer's use of a Taser "was reasonably proportionate to the difficult, tense and uncertain situation" during a traffic stop of a commercial truck driver, when the driver was continuously "hostile, belligerent, and uncooperative;" used profanity; moved around in an agitated fashion; yelled at the officer; and refused to comply with five separate verbal orders to provide his vehicle documents. "Although being struck by a taser gun is an unpleasant experience, the amount of force [the officer] used–a single use of the taser gun causing a one-time shocking–was reasonably proportionate to the need for force and did not inflict any serious injury. . . . The single use of the taser gun may well have prevented a physical struggle and serious harm to either" plaintiff or defendant.); <u>Hinton v. City of Elwood</u>, 997 F.2d 774, 776-77, 781 (10th Cir. 1993) (It was not excessive for officers to use

electrical stun gun on plaintiff after grabbing and wrestling him to the ground, when he was actively resisting arrest by kicking and biting the officers, had shoved one of them to start the fight and the officers had warned him, before the shove, that they would arrest him "if he engaged in one more outburst."); compare Casey v. City of Fed. Heights, 509 F.3d 1278, 1281-82, 1285 (10th Cir. 2007) (Officer's use of Taser immediately and without warning upon her arrival at scene was not objectively reasonable when plaintiff's misdemeanor conduct was neither serious nor a violent crime, officer had no reason to believe that plaintiff posed an immediate threat to anyone's safety, officer never ordered plaintiff to submit to arrest and plaintiff was neither actively resisting nor attempting to avoid arrest by flight. Officer "was not entitled under these circumstances to shoot first and ask questions later."). Accordingly, Detective Harris and Deputy Crain are entitled to qualified immunity.

20.     Barnes also claims that he received constitutionally inadequate medical care at Washington Parish Jail after his arrest and throughout his incarceration as a pretrial detainee and for about one month as a convicted inmate.

21.     Before the Fifth Circuit's decision in Hare v. City of Corinth, 74 F.3d 633 (5th Cir. 1996), it appeared that prison officials must provide pretrial detainees with reasonable medical care unless the failure to provide it was reasonably related to a legitimate government interest. Bell v. Wolfish, 441 U.S. 520, 539 (1979); Cupit v.

Jones, 835 F.2d 82, 85 (5th Cir. 1987); Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

The inquiry was "whether the denial of medical care . . . was objectively reasonable in light of the Fourteenth Amendment's guarantee of reasonable medical care and prohibition on punishment of pretrial detainees." Pfannstiel v. City of Marion, 918 F.2d 1178, 1186 (5th Cir. 1990), abrogated on other grounds as recognized in Martin v. Thomas, 973 F.2d 449, 455 (5th Cir. 1992).

22.     In Hare, however, the Fifth Circuit held:

> (1) that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement; and (2) that a state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.

Hare, 74 F.3d at 650. The Fifth Circuit explained that for the Bell "reasonable relationship" test to be applicable, the pretrial detainee must be able to show that a prison official's act either "implement[s] a rule or restriction or otherwise demonstrate[s] the existence of an identifiable intended condition or practice" or that the "official's acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice." Id. at 645.  If the pretrial detainee is unable to prove either, the incident will be considered to be an episodic act or omission, and the deliberate indifference standard enunciated in

Estelle v. Gamble, 429 U.S. 97, 104 (1976), will apply.  Tamez v. Manthey, 589 F.3d 764, 769-70 (5th Cir. 2009); Hare, 74 F.3d at 650.

23.     In Estelle, the Supreme Court held that a convicted prisoner may succeed on a claim for damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors.  Only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment.  Estelle, 429 U.S. at 105-06; accord Gregg v. Georgia, 428 U.S. 153, 182-83 (1976); Hare, 74 F.3d at 650.  "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847.  The Farmer definition applies to Eighth Amendment medical claims.  Reeves, 27 F.3d at 176.

24.     An inmate must satisfy two requirements to prove that a prison official has violated the Eighth Amendment with regard to medical care.  If the court finds that one of the components of the test is not proven, it need not address the other component. Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998).

25.     "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized

measure of life's necessities." <u>Farmer</u>, 511 U.S. at 834 (quotation omitted). Thus, plaintiff must show that defendants "exhibited deliberate indifference to his serious medical needs." <u>Cooper v. Johnson</u>, 353 Fed. Appx. 965, 2009 WL 4279851, at *2 (5th Cir. 2009) (citing <u>Wilson v. Seiter</u>, 501 U.S. 294, 297 (1991)); <u>accord</u> <u>Harris v. Hegmann</u>, 198 F.3d 153, 159 (5th Cir. 1999); <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 193 (5th Cir. 1993).

26. Further, plaintiff must establish that defendant possessed a culpable state of mind. <u>Farmer</u>, 511 U.S. at 838 (citing <u>Wilson</u>, 501 U.S. at 298). A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837; <u>accord</u> <u>Tamez</u>, 589 F.3d at 777 (citing <u>Thompson v. Upshur County</u>, 245 F.3d 447, 458-59 (5th Cir. 2001)). "Such a showing requires the inmate to allege that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would <u>clearly evince a wanton disregard</u> for any serious medical needs.'" <u>Brewster v. Dretke</u>, 587 F.3d 764, 770 (5th Cir. 2009) (quoting <u>Domino v. Texas Dep't of Crim. Justice</u>, 239 F.3d 752, 756 (5th Cir. 2001)) (emphasis added).

27. The Supreme Court has recently reaffirmed that "'deliberate indifference' is a <u>stringent</u> standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." . . . The "deliberate indifference" standard permits courts to separate omissions that amount to an intentional choice from those that are merely unintentionally negligent oversight[s].

<u>Southard v. Texas Bd. of Crim. Justice</u>, 114 F.3d 539, 551 (5th Cir. 1997) (quoting <u>Board of County Comm'rs v. Brown</u>, 520 U.S. 397, 410 (1997) (other quotations omitted)) (emphasis added). "'Subjective recklessness,'" as used in the criminal law, is the appropriate test for deliberate indifference." <u>Norton v. Dimazana</u>, 122 F.3d 286, 291 (5th Cir. 1997).

28. In the instant case, plaintiff's testimony and the other evidence establish that nothing more than episodic acts or omissions as defined in <u>Hare</u> are at issue. <u>See</u> <u>Tamez</u>, 589 F.3d at 770 (defendants' alleged refusal "to provide [prisoner] with immediate medical treatment qualifies as an 'episodic act or omission'"). Therefore, the "deliberate indifference" standard applies and Barnes must prove that defendants Sheriff Crowe, Warden Topps and Brumfield knew that he faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. In this case, the evidence wholly fails to prove facts sufficient to satisfy the stringent "deliberate indifference" standard.

29.     Plaintiff's testimony and the medical records negate any inference that any defendant acted with deliberate indifference to his serious medical needs.  Initially, it cannot be concluded that the conditions Barnes described, including lacerations on his head, mouth and right eye, soreness in his rib area for a few weeks, subsequent blurred vision in his right eye, "migraine headaches" and pressure in his head, presented serious medical needs that posed a substantial risk of harm during his incarceration at the jail.

30.     First, there is no credible evidence that Barnes suffered serious injuries during his arrest on May 1, 2008.  Detective Harris and Deputy Crain credibly testified that he did not complain of any injuries to them after he was finally subdued.  The Booking Medical Sheet indicates that he had no visible signs of trauma when he was processed into the jail on that date.

31.     Plaintiff's own testimony that he was bleeding profusely when he was arrested was contradicted by this evidence and was not credible.  His mother, Ms. Barnes, credibly testified that he had a laceration on his face that was "almost healed" about three weeks after he was arrested, which confirms that the laceration was not serious, did not require extensive medical care and healed in a relatively short time.  Ms. Barnes did not testify that plaintiff exhibited or complained of any other injuries on that date.

32.     Second, even assuming that Barnes had the medical conditions that he described when and after he was booked into the jail, his complaints do not rise to the

level of a <u>serious</u> medical need for purposes of constitutional analysis. <u>See</u> <u>Vaughn v. City of Lebanon</u>, 18 Fed. Appx. 252, 2001 WL 966279, at *20 (6th Cir. 2001) (no serious medical need when treating physicians analogized plaintiff's pepper-spray-related symptoms to a case of poison ivy and when his cuts, bruises and abrasions from struggle were visible but not permanent); <u>Wesson v. Oglesby</u>, 910 F.2d 278, 284 (5th Cir. 1990) (swollen, bleeding wrists from handcuffs that were too tight do not constitute serious medical need); <u>Martin v. Tyson</u>, 845 F.2d 1451, 1457-58 (7th Cir. 1988) (toothache and ear infection not sufficiently serious); <u>Martin v. Gentile</u>, 849 F.2d 863, 871 (4th Cir. 1988) (sliver of glass in detainee's palm and minor cuts and bruises were not serious injuries); <u>Willacy v. County of Brevard</u>, No. 04-cv-1666-Orl-18DAB, 2007 WL 1017657, at *9 (M.D. Fla. Mar. 30, 2007) (inmate who alleged that he suffered numerous lacerations, contusions, bruising and burning sensation in his eyes after being attacked by another inmate, but did not seek further medical assistance after his wounds were cleaned, failed to assert a serious medical need); <u>Banks v. Mannoia</u>, 890 F. Supp. 95, 99 (N.D.N.Y. 1995) ("bowel problems" and headaches not considered serious medical problems).

33.     Even assuming (without concluding), however, that plaintiff's lacerations, soreness, blurred vision, headaches and pressure in his head, allegedly resulting from the circumstances of his arrest, were serious conditions for constitutional purposes, the

evidence negates any inference of deliberate indifference by jail officials and shows that he received constitutionally adequate medical care while incarcerated at the jail.

34. The evidence establishes that Barnes was provided with medical attention on July 17, July 21, August 14 and August 18, 2008 and January 21, 2009, including transport to the hospital outpatient clinic, physical examinations, blood and urine tests and a CT scan of his brain. Other than a rash on one occasion and decreased vision in his right eye, his physical examinations were consistently normal. See Baker v. Brantley County, 832 F. Supp. 346, 352 (S.D. Ga. 1993), aff'd, 19 F.3d 37 (11th Cir. 1994) (no deliberate indifference to serious medical need of pneumonia when plaintiff was examined twice by emergency medical technician and twice by physician, and plaintiff received prescription medication); Pierre v. Gruler, No. 3:06-cv-45-J-32JRK, 2009 WL 383352, at *10 (M.D. Fla. Feb. 16, 2009) (Jail physician was not deliberately indifferent to plaintiff's shoulder injury resulting from fall to the ground after being shot with a Taser when plaintiff "received extensive and reasonable medical treatment by" physician and other medical providers at the jail and was "promptly referred" to an orthopedic surgeon.).

35. Although Barnes has expressed dissatisfaction with his treatment in this regard, none of his allegations rise to the level of deliberate indifference necessary to establish a constitutional violation cognizable under Section 1983.

> [T]he decision whether to provide additional treatment is a classic example of a matter for medical judgment. A showing of deliberate indifference requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Deliberate indifference is an extremely high standard to meet.

Gobert, 463 F.3d at 346 (footnotes, citations and internal quotations omitted). Plaintiff made no such showing at trial.

36.     First, mere delay in receiving care is not in and of itself a constitutional violation. Easter v. Powell, 467 F.3d 459, 463 (5th Cir. 2006); Mendoza, 989 F.2d at 195; Wesson v. Oglesby, 910 F.2d 278, 284 (5th Cir. 1990). Regardless of the length of delay, plaintiff at a minimum must show deliberate indifference to serious medical needs. Wilson, 501 U.S. at 298. There is no evidence that the delays about which Barnes complains, from May 1 until he first saw a doctor on July 17, 2008, and from August 18, 2008 when he had the CT scan until he saw a doctor for followup on January 21, 2009, caused "a life-long handicap or permanent loss" sufficient to constitute a serious medical need for constitutional purposes. See Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994) (citing Monmouth County v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) ("Where the delay [in medical care] results in an inmate's suffering 'a life-long handicap or permanent loss, the medical need is serious.'")); Wesson, 910 F.2d at 283-84 (minor delay in escorting injured prisoner to prison infirmary for treatment of

swollen wrists with some bleeding cannot be construed as deliberate indifference to serious medical needs). No such permanent loss resulting from delay has been proven in this case.

37. Second, contentions like Barnes's that amount to a mere disagreement with the speed, quality or extent of medical treatment or even negligence do not give rise to a Section 1983 claim. Barnes has not alleged a state law negligence claim. Thus, even if Brumfield was negligent in scheduling a followup appointment, as she stated in her December 2, 2008 letter, she could not be found liable for a constitutional violation. "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not." Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted) (active treatment of prisoner's serious medical condition, which ultimately resulted in death, does not constitute deliberate indifference, even if treatment was negligently administered); see also Rowe v. Norris, 198 Fed. Appx. 579, 2006 WL 2711945, at *2 (8th Cir. 2006) (no constitutional violation when inmate disagreed with physician's choice of medication); Marksberry v. O'Dea, 173 F.3d 855, 1999 WL 98533, at *2 (6th Cir. Jan. 28, 1999) (plaintiff who alleged inadequate treatment for broken hand failed to state constitutional violation, when he was examined by physician and received x-rays and medication); Mendoza, 989 F.2d at 193 (prisoner's disagreement with the type or timing of medical services provided cannot

support a Section 1983 claim); <u>Wesson</u>, 910 F.2d at 284 (allegations establishing provision of medical treatment found inconsistent with inference of deliberate indifference); <u>Williams v. Browning</u>, No. V-03-157, 2006 WL 83433, at *1, *3 (S.D. Tex. Jan. 11, 2006) (inmate with diabetes, hypertension, anxiety and chronic knee ailment who alleged that he was unable to obtain his medications timely, but did not allege that he suffered any substantial harm from the delay, failed to state a claim for deliberate indifference).

38.     The pretrial order, Record Doc. No. 19, contains no claim in this case pursuant to <u>Monell v. Department of Soc. Servs.</u>, 436 U.S. 658 (1978).  In any event, no evidence sufficient to establish either <u>Monell</u>-type liability or Sheriff Crowe's direct involvement in the subject events has been introduced.  Accordingly, there is no basis for liability as to plaintiff's claims against Sheriff Crowe, and the claims are dismissed as to Sheriff Crowe on that basis.

39.     Defendants are entitled to recover their costs pursuant to Fed. R. Civ. P. 54(d)(1).

## **<u>CONCLUSION</u>**

To whatever extent any part of the foregoing conclusions of law constitute findings of fact, and vice versa, they are adopted as such.

For all of the foregoing reasons, judgment will be separately entered in accordance with these findings of fact and conclusions of law.

New Orleans, Louisiana, this ____21st____ day of May, 2010.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE